SHOREY (HARTSHORN v.). See Case No. 6,167.

## Case No. 12,806.

### SHOREY et al. v. RENNELL.

[1 Spr. 407.] [1]

District Court, D. Massachusetts. April, 1858.

SEAMEN—ILLEGAL PUNISHMENT—RIGHT TO PROTECTION—LISTENING TO COMPLAINTS.

1. Any officer of a vessel may use force. when necessary, to coerce the performance of duty by a seaman, when an exigency requires instant obedience.

2. But no one but the highest officer on board, can inflict punishment for a past offence, for the purpose of reformation or example.

3. Knocking a man down with a belaying pin, is an illegal mode of punishment.

4. The crew of a vessel have a right to the protection of the master against illegal violence from his officers. He ought to listen to their complaints, and prevent a repetition of their wrongs.

5. Where the crew, having been maltreated by the mate, without reason. and one of them knocked down with a belaying pin, and having good reason to apprehend future violence. appealed to the master in a respectful manner, stating their grievances, and requesting to see the consul, and declaring that they would do no more duty under the mate, the vessel then being safely in port: Held, that the master had no right to require their further services, without listening to their complaints. and taking measures, or giving assurance, that they should be protected from future wrong and outrage from the mate.

6. Where the master of a vessel causes any of his crew to be confined in a foreign jail. he ought to see that their condition and treatment there, is such as humanity requires.

7. Where seamen have been confined in jail on shore, the master ought not. on their return to the ship, to inflict punishment for threats sup-

posed to have been uttered by them while in jail. without seeing the men and hearing their statements.

8. It does not necessarily follow, because a wrong is attempted upon a seaman, that he may use every kind and degree of resistance. If the wrong be such as will admit of complete indemnity, such resistance cannot be resorted to.

9. The master is civilly responsible for his ill treatment of the crew on board of his ship notwithstanding the advice or direction of the consul.

In admiralty.

C. G. Thomas, for libellants.

T. H. Prince, for respondent.

SPRAGUE, District Judge. These are five libels by seamen against the master of the ship Anna Kimball, for alleged personal wrongs and violence, while at the island of Mauritius. In August, 1856, the libellants shipped at Calcutta, for a voyage to Boston. When three days out from the Sand-heads, they had heavy weather, and the ship leaked badly. The crew in the forecastle consisted of seventeen men. Some of them went aft and requested the captain to put back, on account of the leak; he replied that the wind would be ahead, and that he would put into the first port for repairs; in this answer the crew acquiesced, and continued, without further objection, to do their duty, although the labor at the pumps and working the vessel was severe, until their arrival at Mauritius, one month and twenty days after leaving Calcutta. After arriving at Mauritius, the libellants and the rest of the crew moored the ship safely, secured the sails. and performed every duty. until the morning of the second day, when the libellants told the mate that they wished to see the captain; they then went aft, and told the captain that they wished to be discharged. because they were dissatisfied with the ship. They complained

---

[1] [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

of ill treatment of the crew by the mates, and of a want of provisions. Up to this time, it is conceded, the master personally had treated the crew well, nor does it appear that he had ever heard that they had complained, or had cause to complain of bad treatment by the officers. These seamen then specified their grievances, that one man had been frequently beaten by the mate, with a piece of ratline stuff; that another had been struck while at the wheel; and that a third, by the name of Shivelbein, had been knocked down and beaten by the second mate, with a belaying pin; and that the quantity of beer served out to the crew was insufficient. To these complaints the captain paid no attention, and although the second mate, who was present, declared that he had knocked down Shivelbein, as alleged, and would do so again, the captain took no notice of it, but at once ordered the men to their duty. The libellants then declared that they would do no more duty, until they had seen the American consul. In this interview the captain was in the wrong; and as this first error probably led to all the subsequent difficulties, it requires further examination. It appears by the evidence, that the complaints were not groundless. There is no doubt, that one man had been beaten several times by the mate, with a piece of ratline stuff, and that another was knocked down with a belaying pin, and there is reason to believe that a third had been struck at the wheel. As to the provisions, complaint was made to the mate by some of the crew, that the quantity of beef allowed was insufficient, and that for want of fresh water, the rice and beans could not be cooked. And I think that the weight of the evidence is, that the supply was not ample, especially considering the extra labor they were subjected to in pumping.

When the libellants went aft and asked for their discharge, the captain was bound to listen to and investigate their complaints, and he had no reason for refusing to perform this duty. The libellants had shown no symptoms of combination or insubordination, and the mates had severally inflicted violence upon the men, as above stated, to which no resistance was made, and none of the crew lifted a hand, or uttered a word, in their defence. All had performed their duty, until the ship had been safely moored in port. The captain had no reason to doubt their sincerity; they had shipped to go to Boston, without expecting to put into Mauritius; they had not been on shore, and had not been tempted to leave the ship by the seductions of the place, or the offer of higher wages; they were not indebted to the ship, on the contrary, all had at least twenty days wages due, which they offered to relinquish, in order to get a discharge. The case of Shivelbein imperiously demanded the interposition of the captain. Whether he had deserved any punishment is left in doubt by the evidence, but even if he had, the infliction of

any punishment by the second mate was unlawful. Any officer may use force when necessary to coerce the performance of a duty, when an exigency requires instant obedience, but no one but the highest officer on board can inflict punishment for a past offence, for the purpose of reformation or example. The offence imputed to Shivelbein did not require immediate action; it could have awaited the decision of the master. But the punishment of knocking down with a belaying pin would have been illegal, if inflicted by the master himself. It is a great mistake to suppose that the master has performed his whole duty, when he abstains from personal wrongs to the men. They have a right to his protection against illegal violence from his officers, and he is bound to hear their complaints, and prevent a repetition of their wrongs, and yet he not only turned a deaf ear to their other grievances, but when the second mate avowed the outrage he had committed, and a determination to repeat it, he only ordered the libellants to their work. He thus tacitly sanctioned the past conduct of his officers, and encouraged a repetition of it in the future. Thus not only the men who had been illegally punished, but the rest of the libellants were left subject to outrage from the mates, without even an assurance of the protection or interposition of the master. I do not think that the master had any right to their further services upon such conditions; and he ought either to have granted them other terms, or to have discharged them; and as he refused any other terms, and the ship was then safely moored in port, the master and consul ought to have granted them a discharge. After the libellants had declared, as above stated, that they would do no more duty, the captain went ashore and obtained, under an order from the consul, a police force, with which he returned and took them before the consul, not as persons who had requested their discharge, or appealed to his authority, but as culprits, upon his complaint of having refused duty; and it was that charge which the consul proceeded to hear. Their defence, if gone into, must have involved an investigation of their grievances, but it was not gone into; the consul only inquired whether they had refused duty, and declined hearing anything in justification or excuse. In answer to his peremptory question, whether they refused duty, they answered that they did, as they could obtain no satisfaction; and thereupon, by order of the consul, they were all sent to jail, on shore, where the libellants remained thirty-three days. At the end of that time, the ship being about ready for sea, the consul employed a police force to carry them on board, and directed the officer to carry them in irons, which he refused to do. On coming alongside of the ship, the mate ordered the men to come on board singly; about half the men obeyed the order by going successively up the ladder, and over the rail, but

the rest, in violation of it, got in over the bulwarks at the same time. Shorey went up the ladder in obedience to the order of the mate, and was the first man on board; he was immediately told by the mate that he must go into irons; he replied that he would not, until he had seen the captain. The mate answered that he was on shore, and had given orders that the men should be so confined, and laid hold of Shorey's arm and attempted to put the irons around his wrists; Shorey pulled away his hand with the irons in it, and threw them overboard. The mate thereupon got his revolver and approached Shorey. Whether the revolver was wrested from his hand by Shorey, or by the police officer, or delivered up by the mate, is left in doubt; but it was not fired, and was finally put by the officer of the police into his own pocket. While this was going on, the second mate got into a conflict with some of the men; how it began does not satisfactorily appear. In this conflict the second mate suffered in his face, which bore marks of scratches and pieces of skin taken off. The policemen, six in number, were on deck, and refused to put the seamen into fetters, saying that they had no orders. The men went forward, and the mate sent a message to the captain on shore.

Let us here inquire, whether it was justifiable on the part of the master and mate, to put these men in irons, the moment they reached the deck, without allowing them to go to their chests, or to make any change of the clothes which they had worn day and night for thirty-three days in jail, or to cleanse them from the vermin. The only reason for it, in addition to the facts I have already detailed, was that they had uttered threats. But this is not proved. It is alleged they used threatening language, while in jail; but for this the captain and consul could have only rumor or hearsay. Not one of these seamen had, at any time, done or attempted any violence; and before the captain proceeded to inflict punishment by confinement on ship-board, for supposed threats in jail, I think he should have seen them, heard their statement, and learned, by a personal interview, their state of mind, and the effect of a month's imprisonment. Indeed, whenever a master of a ship thinks it necessary to cause any of his crew to be confined in a foreign jail, he ought to pay some regard to their condition and treatment there, and should, from personal examination, or at least through a reliable agent, see that they are such as humanity requires; and yet it does not appear, that either the captain, or the consul, ever visited the jail, or sent any one; except that the consul's clerk went twice a week to pay the jail fees. The attempt to put Shorey in irons was not justifiable. But it does not necessarily follow, because a wrong is attempted upon a seaman, that he may use every kind and degree of resist-

ance. In cases where the wrong is such as will admit of complete indemnity, the policy of the law requires present submission, rather than a resort to violence; but Shorey neither inflicted, nor attempted to inflict any injury upon the mate; he merely withdrew his hand and threw the irons overboard.

About two hours after these occurrences, the captain came on board, accompanied by the consul, four ship-masters, and a passenger by the name of Rollins. They went into the cabin, and after remaining there a short time, came on deck, all seven with pistols in their hands; the captain and some others had revolvers. They took their station near the cabin gangway, with the police force on the left. The captain, or consul, then called upon the mate to state what had taken place upon the men's coming on board, and he thereupon gave his version of the affair. The six seamen at this time were all upon the top-gallant forecastle, unarmed and quiet. The captain directed the mate to order, or to bring, Shorey aft. The mate went forward and some of the police also, the mate gave the order to Shorey, who got down from the forecastle to proceed aft, when either the second mate, or some of the police, said to these men, "You are all wanted aft," and thereupon they all got off the forecastle, Lewis being the first, and following just behind Shorey; the mate then took hold of Lewis by the clothes on his breast, probably to prevent his going aft, and Lewis took hold of the mate in the same manner; some struggle ensued, but no blows, or attempt to injure each other. Upon seeing this, the captain, or the consul, cried out to his party, who had all remained near the cabin door, "Forward men, and fire:" and thereupon all the seven men rushed forward, pistol in hand, the captain and consul taking the lead, till they approached near the mate and Lewis, and then attempted to fire at the latter; the captain's pistol only exploded the cap, but the consul's went off, and his ball passed through the mate's hand into his wrist; it must have passed very near the body of Lewis, as the mate was holding him with that hand by the breast; the firing continued until there had been from six to twelve shots, but fortunately none but the first took effect. Shorey continued to go aft, till he reached where the carpenter stood with the irons, when he voluntarily put out his hands to have them put on; all the rest of the men, except Shivelbein and Batsford, also went aft during the firing, and quietly had manacles put on them by the carpenter. Shivelbein and Batsford retreated forward, and got again upon the top-gallant forecastle, the former on the starboard and the latter on the port side. The captain and others pressed forward with revolvers, and fired several shots. Shivelbein laid hold of capstan bars,

which were lying upon the forecastle, and threw them at the captain and his party, who were upon the main deck; one of them hit the captain in the forehead and inflicted a severe injury, but not such as to disable him, or prevent his continuing the business in hand. The most of the witnesses say that the captain fired at Shivelbein, before the latter threw a capstan bar; some that the captain was pointing at Shivelbein and the latter holding a bar. and that the firing and throwing were simultaneous; at last Shivelbein was knocked down by some one, and then very severely beaten; in the meantime Batsford, who was on the other side, was knocked down by the second mate with some weapon, very severely beaten by two persons, and thrown off the top-gallant forecastle on to the main deck. Shivelbein and Batsford, after being beaten as before stated, were carried aft, bleeding profusely, and both put into irons. Shivelbein, when taken aft, was wholly unconscious, and so remained for at least fifteen minutes, some say much longer. Finding that he remained wholly insensible, the fetters were taken off him. Batsford was also put into irons; he had lost his consciousness, but only for a short time. The captain and consul were unjustifiably rash and precipitate in calling out to their party, and rushing forward and firing as they did. I must presume that they really thought it necessary, in order to protect the mate and suppress a mutiny; but the evidence clearly shows that no such necessity existed. They doubtless had received from the mate, while on shore, and after they came on board, an inflamed statement of what had taken place in the morning, and their coming on board, as they did, with so many men armed with deadly weapons, can be accounted for only upon the supposition, that they expected to encounter a set of desperate mutineers. Being under the excitement of such apprehensions, when they saw the seamen get off the forecastle, and the occurrence between the mate and Lewis, they were impressed with the belief that the seamen were going to make a rush to protect Shorey. Now it is shown by the evidence, that this was an entire mistake. The seamen were quietly standing upon the top-gallant forecastle. When they got off, they were wholly unarmed, and were about to proceed aft, in the face of seven able-bodied men with pistols in their hands, and the police force. The men were proceeding quietly aft, in obedience to a supposed order. when the mate seized Lewis as above stated. But the mate did not call for any assistance, or make any explanation. or appear to a cool observer to be in any danger. I rely much for this part of the transaction, upon the testimony of Mr. Rollins, the passenger. a witness for the captain, who. although he was one of the captain's party. taken by him from the shore, armed like the rest, and

testified that he was a friend of the captain, yet has given his testimony with intelligence and fairness. He says, among other things, that when the captain or consul cried out, "Forward men, and fire," and rushed forward, he immediately followed them, pistol in hand; that as he was advancing, Shorey pushed against him with some force, that he turned toward him. thinking he might intend some violence, but that Shorey only passed quickly aft, and held out his hands to the carpenter, and was put in irons. Now I cannot but think that if the captain and consul had been as cool and self-possessed as Mr. Rollins. this catastrophe would have been avoided; for when Shorey pushed forcibly against him. he had quite as much reason for shooting him, as there was for firing at the other men.

I have stated the facts. which, after careful examination, I think are established by the evidence. I have not overlooked the certificate of the consul, which was introduced by consent. in lieu of his testimony, and which, in many respects, makes a very different representation. A part of the certificate is mere hearsay, and inconsistent with the testimony. But other parts state what fell under the consul's own observation, particularly what took place on board of the ship, after his arrival with the armed party. I have carefully considered his representation of that scene, and given it all the weight due to the source from which it is derived. But it is so utterly inconsistent with the whole testimony in the cause, not only from the numerous witnesses for the libellants, but also from those for the respondent, that I cannot rely upon it as correct. Indeed, so irresistible is the counter-evidence, that the counsel for the respondent has not insisted upon the correctness of the certificate. After the tumult had ceased. and all the libellants had been fettered, water was thrown upon Batsford and Shivelbein, then lying on the deck, to wash off the blood, and all, excepting the latter, were immediately confined below. How long Shivelbein remained insensible, is left doubtful; when consciousness was restored he also was confined below. Batsford and Lewis were put between decks, with their hands in irons, over a chain above their heads, passing from stanchion to stanchion, between their arms; their feet also were fettered; the chain was so high, that Batsford could reach the deck only on tiptoe, and part of his weight was supported by his wrists; in about half an hour. however. the carpenter put a box under his feet, so that he could stand upon them. A part of the time. Batsford and Lewis were confined with their hands in irons, around both a chain and stanchion. Shivelbein and McDonald were put into the forward cabin. their hands and feet in irons. and their arms and legs around stanchions. Shorey was dealt with more severely; he was carried to the store-room, aft

of the after cabin, and there confined alone to a large square stanchion, by irons on his wrists and ankles, the stanchion between his legs and arms, and for a small part of the time, an iron bolt was put into his mouth. His fetters excoriated his wrists and ankles. That the confinement of all these men was for punishment, and not merely for security, is shown not only by the manner in which they were confined, but also by their treatment, as to food and drink. It was Saturday afternoon when they were put below; they had eaten nothing that day, except such breakfast as they got in the prison, and yet they were allowed nothing to eat or drink, until Sunday evening, when a pint of water and one biscuit were given to each; the same allowance was given them again on Monday evening. On Saturday evening, after the seamen had been confined, the master went ashore, on account of the wound he had received in the forehead, and did not return until Monday evening; in the meantime, a physician was sent on board, to examine the wounds of Shivelbein and Batsford, and the consul also came on board, and saw the situation of all the men, except perhaps Shorey. On Monday the captain sent an order to the mate to treat the men humanely; and on the evening of that day the captain came on board, and the prisoners were released, except Shorey, who was taken from the storeroom to the forward cabin, and there placed so that he could lie down, with one leg fastened to a stanchion. On Wednesday morning Shorey was released. They all turned to, except Shorey, who for several days was unable to do anything; and for three weeks was unable to stand at the wheel; it was much longer before he could go aloft. The wounds on the heads of Shivelbein and Batsford were not healed, for the greater part of the passage home. The irons on Shorey had not only taken the skin from his wrists and ankles, but produced sores which continued the greater part of the passage; and for one upon the ankle, he was under the care of a physician, for a month after his arrival. It is insisted, in behalf of the captain, that he is not responsible for any of the punishment inflicted upon the men, because it was done by the order, or approbation, of the consul. Upon the authority of the case of Jordan v. Williams [Case No. 7,528], the captain must be exonerated from liability for the imprisonment on shore, by the order and warrant of the consul. But I cannot extend the same immunity to what was done on board of the ship. There the captain was supreme, and must be responsible in damages for wrongs done to his men, by his authority, or acquiescence. The instructions of the consul might avail him much, in a criminal prosecution, in which malice is an essential ingredient, and a mistake, without evil intent, would be a good defence; but in a civil suit, the question is, whether a wrong has been done to the libellants, and if so, they are entitled to indemnity.

I am sorry to say, that the refusal of the captain to listen to the seamen, is not extraordinary; on the contrary, from the numerous cases which have come before me, I am induced to believe, that it is the course usually adopted by ship-masters. The maxim, that the master must support his officers, is carried to the extent of supporting them, whether right or wrong; or rather, without any inquiry whether they are right or wrong; and the man who makes a complaint, is frequently not only refused a hearing, but is marked as a troublesome fellow; and if several go aft together, the one selected as their spokesman, generally the most intelligent, is marked as a ringleader, and afterwards treated with severity. The consequence is, that the seamen do not complain to the master. When asked, as witnesses in court, why they did not go to him with their grievances, the answer generally is: "It would have done no good, and I should only have got myself into further difficulty." Masters, also, too often shirk the responsibility that belongs to them, respecting the discipline of the crew, and throw it upon the mates, who have no right by law to inflict punishment. When difficulties have arisen, and the mate properly invokes the authority of the master, he is too apt to say,—"Can't you govern the crew without troubling me?"—and the officers are thus required to exercise an authority which the law cannot sanction; and the men are turned over to the judgment or passions of the mates, however ill regulated they may be. The consequence is, that difficulties grow up between the officers and men, from want of supervision by the master; and violence and wrong are committed, until at last he is astonished by some outbreak, or demand, by the crew. Masters seem to think that it would encourage insubordination to listen to the men, and sometimes, even when they reprimand the mates in private, they carefully conceal their disapprobation from the injured seamen. This is a great mistake; a ship's company is a little community by itself. Its head, or governor, is invested with large powers, and is bound to extend his protection to all its members, and they ought not only to receive, but, as far as practicable, to be convinced that they will receive, equal justice at his hands, whatever their respective stations or duties. It is due to the consul, also, to say, that the examination at his office, as represented by the crew, is by no means unprecedented. When a controversy has arisen between a master and his seamen, the parties stand upon unequal grounds; the seamen are confined to the ship, the master goes on shore when he chooses, has the ear of the consul, enters a complaint against the men, makes his own statement of the case, and the men are then brought before the consul, with the bias of presumed guilt against them; and it too often happens, that no other investigation is thought necessary than merely to take the statement of the complainant. And it

thus happens, that the consul sometimes permits himself to be made use of, as an instrument of oppression, instead of extending to the seamen that protection which they had a right to demand from his official character.

I am of opinion that the libellants are severally entitled to recover against the respondent, for all the injuries suffered by his authority or acquiescence, on ship-board.

Decree in favor of Shorey, for $370; Shivelbein, $200; Batsford, $200; Lewis, $50; McDonald, $40.

Several indictments were pending against the captain for the same transaction.

[NOTE. A motion was subsequently made by the garnishee that he might be discharged, on the ground that he had no goods, effects, or credits of the principal in his hands, and prayed to be allowed to make disclosure under oath. Case No. 12,807.]